Poor Clarence Seymour. He had two experienced maritime lawyers, James McManus and Louis Kerner. Mr. McManus died in August of 2015, consequent to being brutally beaten by the Lafayette Police Department a year earlier. Kerner underwent fistula surgery on August 13, 2015, and after was diagnosed as being pre-seizure and was placed on anticonvulsants. After two years of trying, and prior to my surgery and seizure diagnosis, I had finally gotten Longnecker to concede Mr. Seymour's status as a longshoreman and to agree to pay past and future medical indemnity benefits. However, and despite my familiarity with Section 33G from the Venable v. Hill Corp. case before this Court, and perhaps because not one dollar has ever been paid, I spaced and negotiated with Tri-Drill, a minority defendant, for an $8,000 settlement in return for not opposing their summary judgment, which I thought was probably meritorious. Fortunately, Frank Nunez, their attorney, and I realized what a mistake we were about to make and canceled the entire transaction prior to a check being sent or a lease being prepared, much less signed. Longnecker says, without It sounds like you're trying to say there was no settlement, but in your opening brief you just said there should have been collateral estoppel because of what the administrative proceedings said. Where in your opening brief did you argue, just as an initial matter, de novo matter, there was no settlement entered into? All along? I basically said there was no settlement. Well, I don't see it in your brief. If you can point us to something, that would be helpful. I thought you just said the district court was bound by the ALJ's denial of the motion to dismiss. Yes, because there was no settlement. What the ALJ — they said that Longnecker learned that Tri-Drill paid — But I know you made that argument about being bound by the ALJ, but where do you present any argument that, aside from the ALJ being a binding decision, factually there was no settlement? Before the ALJ and in this Court. In other words, I argued before — to Judge Height that there wasn't any settlement and that he should look to the ALJ. What happened with the ALJ after he denies the motion to dismiss? It sat, and then we had a hearing on October the 17th, and that's when you were kind enough to allow me to supplement the record on it. And the ALJ at that time was very concerned because of the possibility of an $8,000 settlement costing this guy $80,000. And again, fortunately, although Longnecker said that they paid $8,000 to settle, there isn't any — there isn't anything in the record that says that. So the ALJ never awarded any money? No. They capitulated. In other words, what they did is they said, we're going to pay you, and then all of a sudden they decided that they were going to file a motion to dismiss. What the ALJ said is that the employer asserted a claim and settled court claims for $8,000, but it did not submit evidence of a fully executed settlement with this motion and has not carried its burden that a fully executed settlement exists. Where is the fully executed settlement? Where's the money? Where is anything? Now, I realize that Frank Newner and I went to the brink, but we canceled the whole thing. All of a sudden I realized that I'd made a terrible mistake. So I don't know why Judge Hike decided even to consider this, which is basically an ALJ jurisdictional matter. And he said that there was a negotiated settlement. Well, we did negotiate a settlement, but it never got signed. The client never agreed to the terms. It was no money passed hands, and we finally pulled ourselves from the brink of cataclysm. I see this as a subsidiary issue in your appeal, because you have several other defendants named. Sure. Yes. Okay. Well, I've covered that. I just want to make sure that Mr. Seymour ends up with his million dollars worth of long-term claims. I mean, really, that's an obligation I have as a lawyer and as a human being. I see. Okay. Now, pertinent to Mr. Seymour, Longnecker rents rigger crews to accept and stow cargo on offshore supply vessels here at Fuchon, and then to have them unload that cargo at the offshore rigs in the Gulf of Mexico, and then later to reload used cargo and return it to the seaport dock in Fuchon. Although Longnecker may choose to assign a particular rigger to any one of the scores of offshore supply vessels, and did so for the first few years that Mr. Seymour was employed, it made a change in 2010 and assigned Mr. Seymour almost exclusively to the Mister Lee and briefly to a co-owned vessel from 2010 through all of 2011 until October 26, 2011. So he went from being a pitch hitter to the owner of the Seymour to the lead batter as a rigger on first Mister Lee, and then he was assigned to the Seacole, Washington, where he would have worked had he not been injured on November 1, 2011, for some eight months according to the captain of the Seacole, Washington, Captain Batto, and until the Anadarko well work had been completed. The fact that one of the Longneckers may have stayed- Each time he's assigned to his different vessel, we redo the seaman analysis? Yes. But he says that. Okay. When he's a rigger whose very job is to go work on different vessels. Well, that's what it was, but then they stopped doing that, and they put him on the same vessel for almost two years, and then they stopped that vessel and they assigned him to Seacole, Washington. But he's still a contract employee from somewhere else, right? Oh, yeah. He's a borrowed servant of Seacole. Seacole uses his own people to do the work and to do that, and when they run out of it, they get Longnecker or some other labor supplier to provide a group of riggers. So, riggers do seaman work. If I were running Longnecker, I would make sure that they never lit any place for long enough to be a seaman. But the riggers are there to put the pipe on board or take it off of the vessel, right? They work exclusively on the vessel. They eat sleep on the vessel. They don't let them out on the deck from the time they leave the dock to the time they got to the Maras Explorer in this particular case. At that particular point, they let them out and they unload. That was when they finally saw that there was pipe dope on the pipe a week after the accident. So, let's go back to the issue of what happened on November the 1st. On November the 1st, what I did is that, by the grace of God, somebody took photographs of the load, and if you look in the record excerpts, tab five, what's exhibit six, you will see a picture that was taken from above of the pipe casing that was done and the location of the accident, which is obscured by the toolbox. So what happened is that the lighting was bad enough that no one saw what happened and they didn't realize that there was pipe dope there. The man fell down. They immediately did an accident report, and they notified Joe Pugh, the operations manager, either later that night or early in the morning, that what had happened, that they did not attribute it to pipe dope because he didn't see it. Now, pipe dope, although you put it on the protectors on the end, is not supposed to be on the casing, and it never is, because people like Crydrill are very competent and conscientious and they clean it out. So nobody ever thought that there may be pipe dope. Now, you're not supposed to get on the pipe, because if there's condensation or anything foreign material, you could slip. And so it was Anadarko who made a policy that you had to get on the pipe, and that's not just from Mr. Seymour or Mr. Billion, but that's from the Mr. Amard, who was a seaport crane operator. Now, there's a big deal about whether there was enough light or not enough light, but as you can see from the picture, there's just not a whole lot of light there, and that's taken down where you get the benefit of it. So it's not until, as I said, a week later that they actually see it. Then it's not until we took people's depositions that they saw, actually saw these pictures, that people said, yeah, I remember there's pipe dope, there was pipe dope there, I'm almost positive that's what he fell on. Now, I realize that's circumstantial evidence, but you know, today, if I walked in from outside and I had an umbrella and I had a raincoat on, you would assume it's raining outside, which it is, and that is the basis for it. Now, Judge Hike basically said he blew off everybody's testimony. He said there's no credible evidence associated. He says only self-serving testimony, unsupported conclusion drawn by the plaintiff. JUSTICE GINSBURG Well, let me just say some excerpts from the deposition. You know, I guess he's asked how he knew he slipped on pipe dope. He says, what else can it be? I'm just saying that's the only thing they had on the pipe. Did you see any pipe dope on the date of the accident? No. Did you see any pipe dope on your boots? I didn't look. How do you know you slipped on pipe dope? Because they had pipe dope all right here indicating. But do you know that you slipped on it? No. So you have no personal knowledge or evidence to prove that there was anything on the joint of pipe that you slipped on on November 1st. Yeah. JUSTICE SOTOMAYOR Agreed. Truthful testimony. But Jesse Billiard, his second rigger, testified very clearly there was pipe dope there and that's what he fell on. Now, he didn't see it at the time, but he saw it later. JUSTICE GINSBURG It's grease, is it not? JUSTICE SOTOMAYOR Yeah, it's grease. It's very similar in color. JUSTICE GINSBURG So it would have been on his pants or would have been on his boots,  JUSTICE SOTOMAYOR If he'd looked, he didn't look. JUSTICE KEITH They're pulling out these incident reports. Why didn't anyone look at the pipe and see it? JUSTICE SOTOMAYOR Because they never even imagined that there would be pipe dope. There was pipe dope on the very edges. You can see in the picture there's pipe dope on the very edges. It's not supposed to be there. It's never been there. JUSTICE GINSBURG It's supposed to be walking on the pipe as opposed to the ledge, right? JUSTICE SOTOMAYOR Yeah, because Anadarkos, you can see here that they've thrown all the slings. It's pre-slung. They've thrown all the slings in the middle and they require you to get up on the pipe, which is fine if the pipe is perfectly clean. If it's not perfectly clean, you're in big trouble. That's basically where we are. Those are the factual deals. We have Joe Pugh who says you're not supposed to do that. You have people who say you had to do it. They didn't see it. It wasn't obvious for whatever, lighting, whatever. That's where we are. I think it's just this jury issue where the jury should decide whether, given the facts and circumstances, that the people had an obligation to clean it, to warn the people, and not to let them get on. You cannot slip on pipe dope if you don't get on the pipe. JUSTICE GINSBURG Let's assume for the sake of argument that he's not a seaman, that he's an independent contractor. Why would, and that his job is to take care of this pipe as a longshoreman would, why did the intermediate defendants have any liability to him at all? Because it's an open on obvious condition. It's within the scope of his expertise. He was not required to do it if he didn't want to. He didn't think it was safe. JUSTICE SOTOMAYOR Okay. Those are fair questions. It was not an open obvious because nobody saw it. He was required to do so because Anadarko said you had to do it. JUSTICE GINSBURG Now, he's not a seaman. JUSTICE SOTOMAYOR Okay. He has no control over anything. You have to have enough light and you have to have a safe place to work. JUSTICE SOTOMAYOR His own son testified that the place was lit up like a football field. JUSTICE SOTOMAYOR And other people testified that it wasn't. And that the crane operator asked that the lights from the Seacoast Washington be dimmed because he couldn't see. And also when the crane went back and forth, it affected the light. So it was so lighting, why in the world in this picture is you can't see very well? And that's a picture that was taken the very same day about two hours after the accident. So questions of fact. Not obvious. Otherwise, if it had been obvious, he wouldn't have stepped on it. If it hadn't been there, he wouldn't have fallen. If it hadn't been required to be on there, he wouldn't have been there at all. In other words, regardless of how much pipe dope is on the pipe, you can't fall if you don't step on it. JUSTICE GINSBURG I thought you said nobody discovered the pipe dope for a week afterwards. JUSTICE SOTOMAYOR That's correct. JUSTICE GINSBURG But now you say it's visible in the picture. JUSTICE SOTOMAYOR It's visible in the picture. JUSTICE GINSBURG But the picture is two hours later. JUSTICE SOTOMAYOR Well, my troops, Billion and other people, identified pipe dope. You can't see pipe dope here. This is where the accident happened, right at this point. You can't see the pipe dope there because the toolbox is in the way. JUSTICE GINSBURG But you could see it elsewhere on the pipe where it wasn't supposed to be. JUSTICE SOTOMAYOR That's what — not me. I couldn't see anything. JUSTICE SOTOMAYOR But I'm talking about the people who were rigors.  JUSTICE SOTOMAYOR Yeah, the people who were actually there. When they looked at the pictures, you should say, this is pipe dope all over the place. That obviously is what occurred. Now, this is all scotch tape and chewing gum. That's what you have to do in order to beat a summary judgment on a turnover case. You have to have a situation where it's totally in somebody else's hands. They had no choice but to do what they did. And if other people had done what they're supposed to do, there would have been no accident. No pipe dope, no accident. Better lighting so you could see, no accident. Not getting on the pipe, no accident. It seems to me, again, I think we've got our little piggy tails over the fence. That's all we have to do at this point. JUSTICE GINSBURG Okay. JUSTICE SOTOMAYOR Yes, ma'am. Thank you. JUSTICE GINSBURG Mr. Tompkins. MR. TOMPKINS Good morning, Your Honors. Peter Tompkins on behalf of two of the four or five appellees, Sequel Marine and Anadarko Petroleum. As the Court's aware, this is a case involving a personal injury of a man who is a certified rigger who by his own testimony was experienced, had training, was the lead rigger for his crew and had an alleged unwitnessed accident and at least as to Sequel and Anadarko, unreported accident. It was only after being involved in litigation that we received a copy of an incident report that was given to LPI but never to us to go look at this alleged scene and see anything that was a problem. He never even reported an injury for the week after this alleged accident while he stayed on board and continued to offload and unload equipment. So the whole case is a surprise to my clients and then even more of a surprise as you read some of the testimony, Judge Jones, that you alluded to where he can't even say what happened or what he slipped in or that he didn't look at his shoe, he didn't see anything there. It's a case that I think Judge Hike was well within his legal rights to deny by way of a summary judgment. I'm here as the alleged borrowing Jones Act employer, I guess, and so I've got a couple more minutes because that's an issue that my other appellees don't. So I will touch on the Jones Act and borrowed liability issue. The 30% rule that was outlined early in Robeson here in the Fifth Circuit and then later in Chandris is well established and it's got to be 30% with some single employer, even the Jenkins District Court case, which is the only case that Mr. Carner cites, even that recognizes that it's got to be a single employer in the history of his employment aboard different fleets of vessels to establish himself as a Jones Act seaman. Judge Hike carefully went through his entire employment history through an LPI, long record properties, and none exceeded roughly 20 or 21%. That seems to be an issue that's more or less conceded by opposing counsel because it's really not briefed at all. Instead, he seems to focus more on the issue of whether this was a new assignment as to SECOR. And I think the evidence there is crystal clear that there was not a new assignment. The Max Welder's case, the Wilcox v. Max Welder's case that was decided by this Court, talks about in order to have a new assignment, there has to be a change in essential duties or a fundamental change in status. You know, Mr. Seamone was a rigger the entire time of his employment through LPI. His essential duties never changed from employer to employer, just like Mr. Wilcox, who was a welder, his duties never changed whether he was on a platform or on a rig. His essential duties remained the same, just like Mr. Seamone, and the same result should be in effect here, that this would not be considered a new assignment. Mr. Kerner cites Captain Batto for the proposition that he was going to be, Mr. Seamone was going to be on this vessel for up to eight more months, when in fact the testimony from Captain Batto was, I don't know how long he would have stayed on board, that's not my call, that's LPI's call. He could have, it's possible, but yet Joe Pugh from LPI says, no, he was only going to be on there for two weeks and then I was going to transfer him to a vessel called the Ministerial League. But we don't control that, C-Corps does not control that, and so what we have is a two-week assignment that clearly under Chandra's would be considered transient and not satisfying the new assignment test that would be required in order for Mr. Seamone to be a seaman. So if he's not a seaman, Judge Jones, as you alluded to, and he's a longshoreman doing traditional loading and unloading of a vessel, which is what he was doing, then he's got a 905B claim against the vessel, and 905B is very clear. The duties owed by the vessel owner and time are limited. There's a turnover duty, which means we've got to turn the vessel over such that an expert and experienced longshoreman can do his work, and we have to warn of any hidden defects. Well, here there was nothing wrong with the vessel. It's allegedly some cargo that Mr. Seamone was personally handling and touching as it came down for hours. He was the person in the best position to see if there was any defect on the cargo, certainly not the vessel, and that's not our burden at that point. We turned over a sound vessel. All the witnesses agree to that. The second test, and again I should point out, the Cyndia 905B, all the cases that follow are not cited in opposing counsel's brief, so I think it's pretty clear just from his lack of briefing that he must realize that he's not going to be able to meet the Cyndia test. But the second one is the active control of the vessel. Did we take over active control of the work area? And again, the answer is no. Mr. Seamone said he was in charge once the operation began. He gave instructions to the crane operator. He did not rely on any instructions from the captain. It was his job at that point, and he did it, and he had the experience to do it. And then finally, the third duty is one where the vessel owner or time charter must intervene if it knows both that there's an unreasonable hazard and also that they couldn't rely on the plaintiff or his co-workers to remedy that hazard, and here there's no evidence that SECOR was aware of this hazard. The plaintiff wasn't even aware of it. He was touching it, walking on it, intimately dealing with it for hours, and he doesn't see it. Certainly there's no evidence that SECOR was aware of a hazard or that it couldn't rely on plaintiff and his co-workers to responsibly address it and either avoid it if it existed at all, which I don't concede, or use an alternative, safer means, which there clearly were. So my time is short, Your Honors, and my co-counsel will address other issues with respect to liability, but I think the evidence clearly shows that Judge Heintz was within his sound reason to issue a summary judgment, and we would seek affirmance of that. Okay, thank you. Ms. Skinner. Good afternoon. I'm Stephanie Skinner, and I represent Seaport, LLC. Seaport did not own the drill pipe in question and did not employ the plaintiff. All Seaport did was provide the dock space and the slip where the SECOR Washington was for this offloading. They also provided some land-based riggers who assisted in offloading the drill pipe from the 18-wheeler, and they provided a land-based crane operator who took directions from Mr. Simone to assist in moving the pipe from the dock to the vessel. In this case, Judge Heintz properly dismissed Mr. Simone's claims against Seaport and all of the liability defendants because there is simply no evidence in the record, if you take it as a whole, from which a reasonable juror could possibly return a verdict in favor of Mr. Simone on his claims. His lawsuit had been pending for three and a half years at the time that Judge Heintz dismissed it. He had filed an original complaint and seven amended complaints. Discovery was complete. His entire lawsuit is premised on the idea, a theory, that he slipped on pipe dope, but in both his briefs and in his deposition testimony, as Judge Jones noted, he repeatedly testified that he had no idea why he fell. He was asked that question repeatedly, and that's in the record at 2613 and 2661, three times. We have to decide that issue for your client. Isn't your argument that even if there was this pipe dope, it wasn't put there by you or tied to you in any way? Well, that's true, and to be clear, there was no pipe dope, and I don't think there's any evidence. How do we know that? How do we know that? But there's no evidence in the record that there was any pipe dope on the pipe at any time in the area where Mr. Simone fell, either before, during, or after he fell, and he admitted that under oath in his deposition. Assuming, arguendo, we say there is a fact issue on whether there was pipe dope, what other arguments do you have, or does that require remanding the claim against your client? No, no, not at all. So you're saying if there is, if you find there is pipe dope, does that require Otherwise, don't you have other arguments about your client's knowledge or connection of any pipe dope to the port? You basically just run the area, right? Mr. Simone admitted, that's right. Mr. Simone admitted that there's no evidence that Seaport put pipe dope on the pipe if we assume that there was pipe dope on there. The Seaport riggers were, had a fraction of the time with the pipe dope as compared to Mr. Simone. He personally handled every joint of pipe for hours on the deck of the ship until his accident happened, and he testified that he saw nothing, no pipe dope, no foreign substance whatsoever. He also testified, and it's in his brief I believe, that he could have slipped on condensation, he could have slipped on dew, he could have had something on the bottom of his boot, but we don't know that because he didn't, he didn't keep his boot. But it's his, it's his burden of proof, and he has admitted on the record that he has no evidence that there was pipe dope on any of the pipe and that that's what caused him, excuse me, that's what caused him to fall. Did I answer your question? I think what he's asking you is, what is the basis for holding you in even if there was pipe dope? Well, there is none because we don't, thank you, there is none. That's what he's looking for. We don't, we, there's no evidence that our riggers could or should have, anyone from Seaport should have seen the pipe dope. And you're absolutely right, we don't owe a duty to Mr. Simone, who's an independent contractor, lead certified rigger who testified he was in charge of the operation and he took no directions from anyone, he didn't need any directions from anyone, and that he alone made the decision to walk on the pipe and he further admitted that it would have been safer and faster for him to simply walk on the deck of the vessel. And under these circumstances, my client had absolutely no duty to him and you are correct. They should be dismissed regardless of whether there was evidence of pipe dope, which we don't think there was, or not. So, in sum, I'm out of time. Thank you very much. I appreciate your time. Okay. Thank you, ma'am. Mr. Correll? Correll. Correll. May it please the Court. Good morning, judges, or good afternoon now. Jeff Correll on behalf of Tri-Drill and I have four minutes and I have five brief points to point out to the Court. First is that Tri-Drill is not contesting Judge Hike's ruling on the settlement. If this Court affirms the settlement, then our cross appeal is moot. Tri-Drill's cross appeal was solely to preserve its right to challenge the trial Court's dismissal of Tri-Drill's motion for summary judgment, which was dismissed as a result of the settlement. If this Court does reverse the lower court on its ruling on the settlement, summary judgment should be rendered in favor of Tri-Drill and this Court has authority to do so. The three reasons that summary judgment should be rendered in favor of Tri-Drill are as follows. Number one, and most importantly, the plaintiff did not oppose Tri-Drill's summary judgment at the lower court, and so its opposition to our cross appeal in this case should be waived. It consented in a footnote in its opposition to the other defendants, noting that it had no opposition to our summary judgment. In fact, counsel for the plaintiff today commented that Tri-Drill's summary judgment was meritorious, and we, of course, agree with him. Keeping that in mind, and in concert with what Judge Barksdale and Costa were asking Ms. Skinner, Tri-Drill maintains that it had no duty to the plaintiff in this particular case. Tri-Drill inspects by it for structural integrity. Part of the process under APSI standards involves application of thread compound, but it does not know where the pipe is going. It does not know, as Mr. Kerner pointed out, that people are going to climb on top of it. Its inspection process is for use in offshore oil and gas exploration and production. It does not inspect pipe to be fit to walk on. The record shows that there is absolutely no evidence in this case linking Tri-Drill's operations to the plaintiff or to the alleged pipe dote. The plaintiff, in its opposition to this court, relies wholly on unsubstantiated assertions, improbable inferences, and unsupported speculation, which is insufficient to defeat Tri-Drill's summary judgment.  He never saw pipe dope while he was loading, and Mr. Billiot admitted that he has no personal knowledge of what Clarence Simon slipped on. Even if this court believes that there was a substance on the end of the pipe, there is no evidence in the record to suggest that Tri-Drill's operations are the reason that the pipe dope was there. Under the circumstances, no reasonable jury could find that Tri-Drill was involved. We will finish my argument and ask the court if it has any questions. No, sir. Thank you, Your Honor. Thank you. Mr. McCloud. Marty McCloud, Phelps Dunbar, on behalf of Longnecker. Judge Costa, the first question that you raised in the appellate's brief, he raised six issues on appeal. Issues five and six dealt with the settlement agreement. Issue five related to whether or not collateral estoppel applied. Issue six related to whether the district had jurisdiction to enforce a settlement agreement. So the answer to your question is no, he did not raise it. And we'd also note that in the opposition to our motion to enforce a settlement that the appellant filed at the district court level, he also raised three issues, none of which challenged whether or not the settlement agreement should be enforced based upon the terms of it. It was really whether we had standing and related issues that are on appeal. None of the factual stuff about, well, we had a tentative agreement and then we moved apart and all that stuff. Exactly right, Your Honor. And their opposition is in the record at 410 through 413. So that's the first issue. But notwithstanding that, you know, based upon my concern that they might raise that issue, I'll just note for the record that under Fifth Circuit authority, under Bell v. Schneckschneider, which is not cited because it was filed, I haven't had a chance to file an opposition brief to that, but it was 36F3rd447449, quote, it is well settled that courts retain the inherent power to enforce agreements entered into the settlement of litigation pending before them. So that's the point. Even if they had alleged it, we say that the courts have that jurisdiction to enforce it. And the second point is that is because it wasn't raised, we didn't put it in there. But the standard for this court's review of that is abuse of discretion, and that's NRA Deepwater Horizon 786F3rd3442015. So that's the first issue. Going to the merits that are actually in their brief, collateral estoppel, obviously we don't think that even applies because there was no final adjudication. What occurred in the ALJ level before Judge Hike enforced the settlement agreement was we had filed a motion to dismiss based upon some evidence that we had heard because one of the defendants didn't participate in a mediation. So we learned that there might be a settlement. We thought there was a settlement. They didn't participate in the mediation. We filed a motion to dismiss before the ALJ. That was in October 2015 was heard. And the ALJ did not issue a final adjudication. What the ALJ said, which is in the record, that, look, this is just premature because we think there may be genuine issues of material fact. We understand that Longnecker was issuing subpoenas to the attorneys to determine whether or not there had been a settlement because we thought it was being hidden from us. And it turned out we were right. We got a subpoena response from Tridel. We got a subpoena response from UV Logistics. And then we used that evidence to file our motion to dismiss before Judge Hike. And Judge Hike looked at that and said, you know, in a short statement, based upon the clear and convincing evidence, there is a settlement. And at the district court, we cited Louisiana Code Civil Code Article 3071, which talks about what's required for a settlement. We also cited the Louisiana Uniform Electronics Transaction Act, 9-2607, and the Louisiana case Gear v. BP American Products, 150 Southern 3rd, 621, as the Third Circuit case. So we think that the record is clear. Number one, the settlement agreement was enforced. They haven't appealed that issue. Number two, there was not collateral estoppel. And number three, clearly Judge Hike had jurisdiction to enforce a settlement between a plaintiff and a tort defendant. Thank you, Your Honor. All right. Thank you very much. Mr. Kerner, rebuttal. To start from the last, where's the settlement agreement? There isn't any. There's no settlement agreement. No money passed to hands. No nothing. The district court was completely in error even considering it. It belonged in the Administrative Law Judge. He should have given deference to what the Administrative Law Judge said. He failed to make the distinction between a settlement agreement and a settlement under Louisiana law. Now, to go back with C-Corps, obviously my case against C-Corps is primarily as a state and less so as under 905B. However, under the estate expert report, there is an OSV code, which requires the captain to be more directly involved in the negotiation with both the OIM at the time it's unloaded and also with the stevedore and sets up specific obligations. And he concluded that C-Corps had some responsibility. Now, there was a dobert on that, but it was never ruled on. And so that is in the summary judgment record. Now, with regard to the new employer, he did the same kind of work, but at a different location on a permanent basis. So he went from one permanent job on Miss Jolie for as long as it went, and after the accident they wanted to send him back to Miss Jolie, and he was too ill to do that. And it would have continued for up to eight months. That's what's in the record. So at that particular point, even though it's the same rigor job, it's done. He goes, as I said, from pinch hitter to a full-time team member, and I think that that starts the clock again. I realize that under the 30% rule, if you look at the first three or four years of his employment, he went from place to place to place. But in the last two years of employment, he stayed on basically two vessels, and for a very brief time another vessel owned by the same company that owned Miss Jolie. Now, with regard to active control, Seaport has more responsibility. They had to provide some place with lights, and they didn't do it. Now, there's testimony all over creation with regard to the amount of lighting that's concerned, and I think, as you can see from the photograph, if they had better light, life would have been different. The second thing was that Amard, the crane operator, who also testified about pipe dope and its dangers, was up there and he could actually see, and he was in charge of the lighting. And he also is a person who said they had no choice. They had to get on there because that was Anadarko's rule. Now, he had the ability to say, I'm sorry, Mr. Anadarko, you can't do that. You know, if you want Mr. Belanger to be there and to supervise it, you can get him out there and he can tell people to do that, but otherwise you can't do it. So they just simply didn't see what was going on, and nothing would have happened had they actually been there. Now, with regard to Tri-Drill, we have an expert report that nails Tri-Drill and says that Tri-Drill is responsible for that. We have testimony from both, we have the expert report from Eshetay as well as the testimony from Amard that you're not supposed to have pipe dope on pipe and that he had never seen pipe dope on pipe before, despite the fact that he probably loaded and unloaded 1,000 vessels over a period of time. Again, this is summary judgment, as you pointed out in the last oral argument. This is not a trial record. This is summary judgment. And so under those circumstances, I think that summary judgment was inappropriate, and the fact that Judge Hike specifically pointed to conflicting evidence in the record and disregarded it, that gets me here and hopefully will be successful. Thank you so much. Thank you very much. Have a good, rainy day. Thank you.